NO. COA13-1053

NORTH CAROLINA COURT OF APPEALS

Filed: 16 September 2014

STEPHEN C. NICHOLSON, Individually
and as Administrator of the Estate
of Geraldine Anne Nicholson,
        Plaintiff,

        v.                              Robeson County
                                        No. 08 CVS 1845
ARLEEN KAYE THOM, M.D.,
        Defendant.


        Appeal by Defendant from Judgment entered 16 October 2012

and Order entered 19 December 2012 by Judge Mary Ann Tally in

Robeson County Superior Court. Heard in the Court of Appeals 19

February 2014.


        *Comerford & Britt, L.L.P., by John A. Chilson and Clifford
        Britt, and Musselwhite, Musselwhite, Branch & Grantham, by
        James W. Musselwhite, for Plaintiff.*

        *Yates McLamb and Weyher, L.L.P., by Dan McLamb and Andrew
        C. Buckner, for Defendant.*[1]


        STEPHENS, Judge.


                            *Background*

        This case arises from claims of negligence and loss of

consortium brought on 21 May 2008 by Plaintiff Stephen C.

---

[1] Different counsel represented Defendant at trial.

Nicholson, administrator of the estate of his wife Geraldine Anne Nicholson ("the decedent"). Prior to 28 June 2005, at the age of fifty-four, the decedent began experiencing heavy rectal bleeding. It was later discovered that she had a cancerous tumor in her rectum. Plaintiff's claims stem from a surgical procedure performed by Defendant Arleen Kaye Thom, M.D., to remove the tumor. The surgery was performed at Cape Fear Valley Medical Center ("Cape Fear") on 28 June 2005. At the time of the surgery, Defendant was a general surgeon with special training and experience in performing cancer surgery. In order to remove the tumor, Defendant made a large abdominal incision to expose the decedent's bowels, a separate incision to completely remove the rectum and anus, and inserted a colostomy bag to allow stool to pass through the abdominal wall.

The decedent's post-surgical treatment included chemotherapy and radiation therapy. Over the next few weeks, as the treatment was beginning, the decedent started to get unusually sick. She had problems with nausea and diarrhea that led to abnormalities with her body chemistry. She got weaker and was readmitted to Cape Fear for weakness, inability to eat, diarrhea, and problems with electrolytes. On 31 August 2005, two months and twenty-six days after the surgery, an X ray revealed

a retained surgical sponge in the right lower quadrant of the decedent's abdomen.

One week later, on 7 September 2005, an additional operation was performed to remove the sponge. The middle part of the decedent's abdomen was reopened, and the sponge was removed. According to expert testimony offered on Plaintiff's behalf, the surgery revealed that "there was a perforation of the bowel [and] the [retained sponge] was contaminated with intestinal contents. There was an abscess[2] around [the sponge and] dense adhesions[3] all the way around." As a result, the surgeon removed a section of the decedent's bowel, spent forty-five minutes dividing the scar tissue that was nearby, and ultimately removed the sponge. The surgeon did not close the skin around the abdominal wall because of "the amount of infection that was present."[4]

After the September surgery, the decedent received additional care for the open wound. She also underwent multiple

---

[2] The expert testified that an abscess is "the combination of bacteria together with the body's inflammatory cells."

[3] An adhesion is "scar tissue."

[4] Specifically, the surgeon "was able to close the inner layer [of the abdominal wound, but] he was not able to close the subcutaneous fat and the skin . . . ."

additional surgeries between September 2005 and February 2006. The first of these additional surgeries was an attempt to close the abdominal wound resulting from the previous surgery. This surgery failed, and another surgery was required to complete that procedure. The decedent also needed a third operation, according to Plaintiff's expert, "because she developed progressive blockage of her intestines from the scar tissue that was related to the sca[r]ring from the sponge." A fourth operation was later required to repair leakage resulting from the third surgery. Lastly, the decedent required surgery to address an infection of the skin. Plaintiff's expert testified that all of these surgeries were necessary as a result of the retained sponge.

The expert also testified that the decedent was not able to complete her chemotherapy and radiation therapy as a result. The decedent's cancer returned in July of 2006 and metastasized to her brain. From the date of her admission to Cape Fear on 31 August 2005 to the date of her death in 2006, the decedent changed hospitals, "but she never left a hospital bed." She died in 2006 as a result of the cancer.

In his complaint, Plaintiff alleged that Defendant negligently failed to remove the surgical sponge from the

decedent's abdomen and, in failing to do so, caused much of "the damage[] sustained by the dece[dent] prior to her death[.]" Specifically, Plaintiff contended that Defendant's actions directly and proximately damaged the decedent in the form of medical bills, pain and suffering, scarring and disfigurement, "multiple additional medical impairments," "multiple additional surgical procedures," 401 days of life spent in the hospital, and an inability to complete recommended cancer treatments leading to a "shortened life expectancy." Plaintiff also brought a cause of action for loss of consortium, asserting that Defendant's alleged negligence caused "a loss and disruption of the marital relationship" he had enjoyed with the decedent, including "the loss and disruption of her marital services, society, affection, companionship and/or sexual relations." Plaintiff did not bring a cause of action for wrongful death. Defendant denied the material allegations of Plaintiff's complaint by answer filed 30 July 2008.

During discovery Plaintiff learned that Defendant had been "disabled" since the middle of August 2005. As a result, Plaintiff served a second request for production of documents on 8 January 2010, seeking a copy of Defendant's application for disability benefits, correspondence regarding that claim, and a

copy of all of Defendant's medical records "that relate or pertain to [a disability] in her left arm that she sustained on or about" 17 August 2005. Plaintiff served a third[5] set of interrogatories on Defendant that same day, seeking the "full details" of the 17 August 2005 injury to Defendant's arm. Defendant objected to these discovery requests on 10 February 2010. One week later Plaintiff filed a motion to compel Defendant to respond to the challenged discovery requests. In an affidavit filed with the trial court, one of Defendant's attorneys averred that he believed the requested documents were protected under the physician-patient privilege. The trial court, Judge Ola M. Lewis presiding, granted Plaintiff's motion to compel by order entered 7 April 2010, with the limitation that the requested documents would be disclosed only to Plaintiff's counsel. Defendant appealed that order to this Court.

Following Defendant's appeal, the trial court entered an order staying discovery until the matter could be reviewed on appeal. Defendant also filed a motion to stay proceedings of the

---

[5] In his brief, Plaintiff appears to refer to these interrogatories as his "[s]econd [s]et of [i]nterrogatories." The supplemental record indicates, however, that the interrogatories at issue were Plaintiff's "third set," not his second.

trial court, and that motion was granted on 15 April 2010. Despite the interlocutory nature of Defendant's appeal, we reviewed the trial court's order granting Plaintiff's motion to compel as affecting a substantial right and affirmed the decision of the trial court. *Nicholson v. Thom*, 214 N.C. App. 561, 714 S.E.2d 868 (2011) (unpublished opinion), *available at* 2011 WL 3570122, at *2, *8 [hereinafter *Nicholson I*], *disc. review denied*, __ N.C. __, 724 S.E.2d 509 (2012). In so holding, we noted that the requested documents were protected by the physician-patient privilege, but pointed out that the trial court is authorized to order the production of documents protected by the physician-patient privilege, in its discretion, when, in the opinion of the judge, they are necessary to serve the proper administration of justice. *Id.* at *4-*5. Because of "the potential relevance of the information contained in the disputed records," we concluded that the trial court did not abuse its discretion by granting Plaintiff's motion to compel. *Id.* at *8. As a consequence, Defendant produced copies of the requested records on 29 March 2012.[6]

---

[6] Plaintiff alleges in his brief that, despite this order, Defendant failed to respond to his "[s]econd" set of interrogatories. As we noted in footnote 5, it is unclear whether Plaintiff is actually referring to his third set of

On 14 May 2012, after reviewing the documents, Plaintiff served a third request for production of documents on Defendant. Specifically, Plaintiff sought access to "all of" Defendant's medical and pharmaceutical records pertaining to: (1) "her cervical spine, cervical disc disease, cervical radiculopathy, cervical stenosis, disc bulge, and laminectomy surgery," including magnetic resonance imaging scans; (2) "her diagnosis, treatment, and monitoring of sacroiliitis"; (3) "her diagnosis and treatment of depression and/or post-traumatic stress disorder"; (4) "her diagnosis and treatment of Parsonage-Turner Syndrome"; and (5) "the brachial plexus neuropathy in her left arm that she sustained on . . . [17 August 2005]." Plaintiff also requested a copy of Defendant's records "from Advanced PT Solutions, UNC Chapel Hill (neurosurgery), Dr. Viren Desai, Dr. Pendleton, Dr. Robertson, Dr. Johnson, Dr. Stratus, Dr. Gluck, Dr. Bettendorf, Home Instead, Kohll's/RxMPSS Pharmacy, CapeFearDiscountDrug, and Walmart Pharmacy." Defendant objected on grounds that the documents were privileged, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence, and Plaintiff again moved to compel production.

---

interrogatories, the subject of the litigation at issue on appeal, or whether he is referring to a separate, second set of interrogatories, which are not included in the record on appeal.

On 7 August 2012, the trial court, Judge James Gregory Bell presiding, allowed Plaintiff's motion to compel. The court concluded that the requested discovery was "relevant and reasonably calculated to lead to the discovery of admissible evidence," "reasonably tailored to address questions raised by the recent production of Defendant's medical and disability records, . . . not overly burdensome, and its probative value outweigh[ed] any potential prejudice to . . . Defendant." The court also concluded that the requested medical records were protected under the physician-patient privilege, but that they "should be produced because the interests of justice outweigh the protected privilege." Defendant appealed that order to this Court on 13 August 2012.[7]

Four days later, on 17 August 2012, Plaintiff served a subpoena and subpoenas *duces tecum* on counsel for Defendant, seeking to have Defendant appear on 21 August 2012, testify, and produce the following documents: (1) "all records requested by Plaintiff in his 3rd [r]equest for [p]roduction of documents

---

[7] The record does not indicate that the trial court entered an order staying the proceedings below or that Defendant sought such a stay pending review by this Court. Nonetheless, there is no evidence that Defendant produced the requested discovery. Rather, the parties proceeded toward trial. Following the trial, Plaintiff moved to dismiss the appeal as moot, and this Court granted that motion.

which were ordered to be produced by . . . Judge Bell on August 7, 2012" and (2) "[t]he original or certified copy of Cape Fear['s] entire chart for [Defendant]." Defendant filed objections and motions to quash on 21 August 2012.[8]

Between August 29 and 31 of 2012, Plaintiff issued fifty-four subpoenas *duces tecum* to various persons, pharmacies, and corporations, requiring them to produce either Defendant's "entire chart" or her medical and pharmaceutical records from between January and September of 2005. Counsel for Defendant was served with copies of those subpoenas on 12 September 2012. On 18 September 2012, Defendant filed an objection and motion to quash these subpoenas or, in the alternative, for entry of a protective order.

The matter came on for trial beginning 1 October 2012 in Robeson County Superior Court, Judge Mary Ann Tally presiding. Following an *in camera* review of the subpoenaed documents, the trial court denied Defendant's motion and allowed certain of the documents to be produced to Plaintiff. The documents were not

---

[8] On 31 August 2012, Plaintiff also served a subpoena *duces tecum* on Cape Fear, again seeking production of Defendant's "entire chart." Cape Fear filed a motion to quash, and the trial court denied that motion on 1 October 2012. Defendant appealed that order to this Court on 30 October 2012, but eventually withdrew that appeal.

admitted into evidence, but were referenced extensively by counsel for Plaintiff in his questioning of Defendant.[9] Plaintiff's counsel also questioned Defendant about descriptions of Defendant's medical condition from sealed affidavits submitted to the trial court in March of 2010. The affidavits, which concerned the state of Defendant's health at that time, had been submitted by two of Defendant's health care providers in support of her request to refrain from attending the trial, which at that time was scheduled to occur in 2010.

Other evidence admitted at trial described the course of the decedent's cancer treatment. In addition, Plaintiff introduced a summary of the decedent's medical bills, totaling $1,219,660.36, approximately $860,000 of which was considered a "write-off[]" by the Cumberland County Hospital System and had not been paid by any source.

At the conclusion of the trial, the jury returned verdicts awarding $5,050,000 to the estate and $750,000 to Plaintiff, individually, for a total award of $5,800,000. The trial court reduced that amount by $1,150,000 pursuant to Plaintiff's settlement with "other defendants in another case" and entered

---

[9] Counsel for Defendant lodged a continuing objection to this line of questioning at the beginning of Defendant's testimony.

judgment against Defendant on 16 October 2012 for a total amount of $4,650,000.[10] On 19 October and 21 November 2012, respectively, Defendant filed motions for "Amendment of Judgment (Remittitur) or New Trial" pursuant to Rule 59(a) and "Relief from Judgment" pursuant to Rule 60(b). The trial court denied those motions by order filed on 19 December 2012. Defendant appealed that order and the trial court's judgment entered upon the jury's verdict to this Court on 15 January 2013.

*Discussion*

On appeal, Defendant argues that the trial court erred by: (1) denying her motion to quash the subpoenas *duces tecum* or, alternatively, for entry of a protective order; (2) providing her medical records to counsel for Plaintiff; (3) allowing counsel for Plaintiff to question her concerning her health and her medical records for the purpose of suggesting that she was impaired during the surgery she performed on the decedent; (4) allowing counsel for Plaintiff to question her and other witnesses about the propriety of advising the decedent of the

---

[10] The trial court's 16 October 2012 judgment does not indicate the name of the other defendants. Other sections of the record on appeal and portions of the trial transcript, however, indicate that the other defendants included the Cumberland County Hospital System, Inc., d/b/a Cape Fear Valley Medical Center.

medications Defendant was taking at the time of the operation; (5) allowing counsel for Plaintiff to introduce evidence of medical bills "which were not actually incurred or paid by [Plaintiff] . . . or any other entity"; (6) instructing the jury on permanent injury; and (7) denying Defendant's motion for amendment of judgment (remittitur) or new trial. As discussed below, we find no error in part, but remand for a new trial on damages.

*I. Defendant's Medical and Pharmacy Records*

*A. Mootness*

As a preliminary matter, we address Plaintiff's argument that Defendant's appeal from the trial court's order denying her motion to quash and allowing the production of her medical and pharmaceutical records is moot because the subpoenaed documents were never entered into evidence. We disagree.

In North Carolina, an issue is moot

> [w]henever[] during the course of litigation it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue[. In those circumstances,] the case should be dismissed [as moot], for courts will not entertain or proceed with a cause merely to determine abstract propositions of law.

*In re Hamilton*, __ N.C. App. __, __, 725 S.E.2d 393, 396 (2012) (citation omitted).

In this case Defendant requests that this Court determine the validity of the trial court's rulings because she contests the *result* stemming from the production of her records to Plaintiff — the extensive use of those documents by Plaintiff during questioning of Defendant. This issue remains in controversy between the parties and, therefore, would not require this Court to merely determine an abstract proposition of law. Therefore, the issue of the validity of the trial court's ruling on the production and use of Defendant's medical and pharmaceutical records is not moot. Accordingly, Plaintiff's argument is overruled, and we proceed with a review of Defendant's arguments on the merits.

*B. Standard of Review*

"When the propriety of a subpoena *duces tecum* is challenged, it is . . . addressed to the sound discretion of the court in which the action is pending." *Vaughn v. Broadfoot*, 267 N.C. 691, 697, 149 S.E.2d 37, 42 (1966). "It is well established that where matters are left to the discretion of the trial court, appellate review is limited to a determination of whether there was a clear abuse of discretion." *White v. White*, 312 N.C.

770, 777, 324 S.E.2d 829, 833 (1985). "A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason . . . [or] upon a showing that [the trial court's ruling] was so arbitrary that it could not have been the result of a reasoned decision." *Id.*

With regard to the production and use of contested medical records, a trial court's determination regarding the applicability of the physician-patient privilege is a legal question, which is reviewed *de novo* on appeal. *See Nicholson I*, 2011 WL 3570122 at *3. However,

> [t]he decision as to whether disclosure of information protected by the physician-patient privilege is required to serve the proper administration of justice is one made in the discretion of the trial judge, and the appellant must show an abuse of discretion in order to successfully challenge the ruling.

*Id.* at *8. Here, the parties do not dispute the fact that Defendant's medical records are protected by the physician-patient privilege. Rather, Defendant contests the validity of the trial court's decisions to produce those documents to Plaintiff and allow Plaintiff to use the documents during

questioning of Defendant. Accordingly, the standard of review for each of these issues is abuse of discretion.[11]

*C. Subpoenas Duces Tecum*

Defendant contends that the trial court abused its discretion in overruling her objection and denying her motion to quash Plaintiff's subpoenas *duces tecum* or, in the alternative, for entry of a protective order because the subpoenas were improperly used for purposes of discovery and their issuance violated the Health Insurance Portability and Accountability Act ("HIPAA"). In response, Plaintiff contends the subpoenas were not issued for the purpose of discovery and Defendant was properly given notice of their issuance and an opportunity to object. We find no error.

*i. The Purpose of the Subpoenas Duces Tecum*

> The subpoena *duces tecum* . . . is the process by which a court requires the production at the trial of documents, papers, or chattels material to the issue. . . .
>
> . . . .
>
> Anything in the nature of a mere fishing expedition is not to be encouraged. A party

---

[11] Defendant argues in her brief that the standard of review in this context is *de novo*. At oral argument, however, counsel for Defendant conceded that the proper standard of review is abuse of discretion.

is not entitled to have brought in a mass of books and papers in order that he may search them through to gather evidence.[12]

The law recognizes the right of a witness subpoenaed *duces tecum* to refuse to produce documents which are not material to the issue or which are of a privileged character. Nevertheless, whether a witness has a reasonable excuse for failing to respond to a subpoena *duces tecum* is to be judged by the court and not by the witness. Though he may have [a] valid excuse for not showing . . . the document in evidence, yet he is bound to produce it, which is a matter for the judgment of the court and not the witness.

. . . . [On a motion to quash] a subpoena *duces tecum* . . ., the court . . . examine[s] the issues raised by the pleadings and, in the light of that examination, . . . determine[s] the apparent relevancy of the documents or the right of the witness to withhold production upon other grounds. An adverse ruling upon [the] movant's motion to quash . . . gives counsel [for the respondent] no right to inspect the books, documents, or chattels ordered to be produced at the trial, nor does it determine the admissibility of [those] items at the trial. The subpoena merely requires the witness to bring them in so that the court, after inspection, may determine their materiality and competency, or so that the witness, by reference to the books or papers, can answer any questions pertinent

---

[12] To the extent this paragraph might be read to allow fishing expeditions under certain circumstances, we note this Court's clarification that such ventures are prohibited in their entirety. *State v. Newell*, 82 N.C. App. 707, 709, 348 S.E.2d 158, 160 (1986).

to the inquiry.

*Vaughn*, 267 N.C. at 695-97, 149 S.E.2d at 40-42 (citations, internal quotation marks, parentheses, and an ellipsis omitted).

Defendant contends that Plaintiff's subpoenas *duces tecum* were improper because they "were not issued to secure evidence for presentation for trial, as proven by the fact that none of the documents were offered into evidence." Rather, Defendant contends, "they were simply an improper form of discovery." We disagree.

The subpoenaed documents were not offered into evidence during the trial because the trial court determined in a pre-trial, *in camera* hearing that they could not be admitted into evidence. This fact was already established by the time the trial began and has no bearing on whether the subpoenas were issued for purposes of engaging in an improper fishing expedition. Indeed, as Plaintiff notes in his brief, his attorneys were never given an opportunity to inspect the subpoenaed documents prior to their production. They were sealed, sent directly to the courthouse, and ultimately inspected by the trial court, which determined that some of the documents should be produced to Plaintiff's counsel for use during the trial, and some should not. Plaintiff was never

allowed to fish through the documents to gather evidence and, thus, was not engaging in discovery. Moreover, in light of our opinion in *Nicholson I*, we believe the trial court's decision that some of the requested records were sufficiently relevant to require production to Plaintiff, but not so relevant as to be admitted as substantive evidence, was neither arbitrary nor manifestly unsupported by reason. *See* 2011 WL 3570122 at *8 ("In view of the potential relevance of the information contained in the disputed records, we are unable to conclude that the trial court abused its discretion by ordering Defendant to produce the requested materials in the interest of justice."). Accordingly, Defendant's argument is overruled.

### ii. HIPAA

In the alternative, Defendant contends that Plaintiff's subpoenas *duces tecum* violated HIPAA because they were not accompanied by a court order showing that "reasonable efforts have been made to ensure that [Defendant was] . . . given notice of the request and an opportunity to object or that efforts have been made to obtain a protective order prohibiting the use of the records for any use other than the proceeding," citing 45

C.F.R. § 164.512(e)(1)(ii). Defendant contends that the alleged violation was prejudicial because her objections would have been heard prior to the issuance of the subpoenas "[h]ad . . . Plaintiff[] sought the order [as] required by HIPAA." Therefore, Defendant alleges, "[t]he trial judge . . . [denied] defense counsel any opportunity to review [the subpoenaed documents] and assert appropriate objections prior to their production." We are unpersuaded.

Section 164.512 of Subchapter C of Title 45, Subtitle A, of the Code of Federal Regulations provides in pertinent part that, under HIPAA:

> A covered entity may use or disclose protected health information without the written authorization of the individual . . . or the opportunity for the individual to agree or object . . . subject to the applicable requirements of this section. . . .
>
> . . . .
>
> (e) *Standard: Disclosures for judicial and administrative proceedings* — (1) *Permitted disclosures*. A covered entity may disclose protected health information in the course of any judicial or administrative proceeding:
>
> . . .
>
> (ii) In response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or

administrative tribunal, if:

>(A) The covered entity receives satisfactory assurance . . . from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or

>(B) The covered entity receives satisfactory assurance . . . from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order . . . .

45 C.F.R. 164.512 (2013). Section 160.102 of Subchapter C also states that:

>(a) Except as otherwise provided, the standards, requirements, and implementation specifications adopted under this subchapter apply to the following entities:

>(1) A health plan.

>(2) A health care clearinghouse.

>(3) A health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter.

45 C.F.R. 160.102 (2013).

To the extent Plaintiff's subpoenas did not comply with the regulations cited above,[13] such violation should be charged

---

[13] We offer no opinion as to whether they did.

against the *covered entities* that provided those records, not against Plaintiff. Section 160.102 clearly states that Subchapter C of HIPAA applies to health plans, health care clearinghouses, and certain health care providers. Plaintiff is none of these things. Assuming without deciding that the subpoenaed entities in this case qualify as "covered entities," it was their obligation to refrain from producing the requested documentation when they received Plaintiff's subpoenas if they determined that the subpoenas did not comply with HIPAA. Because Plaintiff is not a "covered entity" within the meaning of section 160.512, he cannot be held liable under Subchapter C of HIPAA for the subpoenaed entities' production of the requested documents. Therefore, the requirements cited by Defendant have no bearing on whether Plaintiff's subpoenas *duces tecum* were properly issued. Accordingly, Defendant's argument is overruled.

### D. Providing Defendant's Records to Plaintiff

Defendant next argues that the trial court erred by providing Plaintiff with medical and pharmaceutical records that did not comply with its own order. Specifically, Defendant alleges that the trial court provided Plaintiff with records

created after 28 June 2005, despite its explicit statement at trial that documents generated after that date should not be produced to Plaintiff. In response, Plaintiff asserts that "the documents provided to this Court . . . [by Defendant][14] were not properly preserved for appeal" because Defendant did not take the opportunity to preserve a copy of the documents at trial and the documents merely constitute those documents that Defendant "*believes* may have been provided to Plaintiff's trial counsel at trial." (Emphasis in original). Alternatively, Plaintiff asserts that the documents provided to counsel caused Defendant no harm because Plaintiff already knew about her use of pain medications. We find no error.

Rule 11(c) of the North Carolina Rules of Appellate Procedure provides that, when settling the record on appeal,

> [i]f any party to the appeal contends that materials proposed for inclusion in the record or for filing . . . were not filed, served, submitted for consideration, admitted, or made the subject of an offer of proof, or that a statement or narration permitted by these rules is not factually accurate, then that party, within ten days after expiration of the time within which the appellee last served with the

---

[14] These documents were not included in the record on appeal. Rather, they were submitted to this Court, under seal, pursuant to Rule 11(c) of the North Carolina Rules of Appellate Procedure. Plaintiff was not served with a copy.

appellant's proposed record on appeal might have served amendments, objections, or a proposed alternative record on appeal, may in writing request that the judge from whose judgment, order, or other determination appeal was taken settle the record on appeal. A copy of the request, endorsed with a certificate showing service on the judge, shall be filed forthwith in the office of the clerk of the superior court and served upon all other parties. Each party shall promptly provide to the judge a reference copy of the record items, amendments, or objections served by that party in the case.

. . . .

The judge shall send written notice to counsel for all parties setting a place and time for a hearing to settle the record on appeal. The hearing shall be held not later than fifteen days after service of the request for hearing upon the judge. The judge shall settle the record on appeal by order entered not more than twenty days after service of the request for hearing upon the judge. . . .

If any appellee timely serves amendments, objections, or a proposed alternative record on appeal, and no judicial settlement of the record is timely sought, the record is deemed settled at the expiration of the ten day period within which any party could have requested judicial settlement of the record on appeal under this Rule 11(c).

N.C.R. App. P. 11(c).

Citing Rule 11(c), Defendant has provided this Court with a number of documents that she believes were produced to Plaintiff during the trial. In an attached letter to the trial judge,

Defendant requested confirmation that the documents submitted to this Court represent those produced to Plaintiff. Plaintiff's attorneys were provided with a copy of the letter, but not with a copy of the proposed documents. There is no indication in the record before this Court that the accuracy of the documents provided by Defendant was ever verified by the trial judge or that further action was taken to settle the record on appeal with regard to this question.

As described above, Rule 11(c) operates to settle the record on appeal in accordance with the objections of the appellee when no judicial settlement is timely sought at the expiration of the requisite time period. *Id.; see also Johnson v. Nash Comm. Coll.*, 203 N.C. App. 572, 692 S.E.2d 890 (2010) (unpublished opinion), *available at* 2010 WL 1542534 ("When the [appellee] objected to [the appellant's] proposed record on appeal . . . , [the appellant] filed a statement that he was not requesting judicial settlement. The record on appeal was, therefore, deemed settled in accordance with the [appellee's] objections by operation of Rule 11(c) . . . .").[15] Rule 11(c)

---

[15] *Johnson* is an unpublished opinion and, therefore, has no precedential value. N.C.R. App. P. 30(e). Nevertheless, case law on Rule 11(c) is scant, and our opinion in *Johnson* provides a helpful example of the practical application of this rule.

makes no provision, however, for the requirements for settling the record on appeal when the appellant is admittedly unsure about the nature of the proposed supplement to the record, requests judicial settlement, does not serve the proposed documentation on the appellee, and judicial settlement never occurs. In that circumstance, we must default to the broader requirements of Rule 9(a).

Rule 9(a) states in pertinent part that "review is solely upon the record on appeal." N.C.R. App. P. 9(a).

> This Court has held that where certain exhibits presented to the trial court were not included in the record on appeal, those exhibits could not be considered on review to this Court. To raise the issue of the sufficiency of the evidence to support that finding on appeal, [the] defendant must preserve the record for appeal. Where the record is silent[,] we will presume the trial court acted correctly.

*State v. Reaves*, 132 N.C. App. 615, 619–20, 513 S.E.2d 562, 565 (citations and internal quotation marks omitted), *disc. review denied*, 350 N.C. 846, 539 S.E.2d 4 (1999). When the record is "not completely silent," but fails to include the information necessary for appellate review, "we presume the correctness of the trial court's decision." *See id.* at 620, 513 S.E.2d at 565 (presuming the correctness of the trial court's decision to order the defendant to produce a report, which the defendant

argued was protected work product, when the record on appeal included references to the content of the report, but did not include the report itself).

Regarding the documents produced to Plaintiff in this case, the trial court ruled as follows:

> THE COURT: . . . .
>
> . . . .
>
> I have reviewed the medical records and information of [Defendant] that was provided pursuant to the subpoenas. And after reviewing that information, I find that it's in the interest of justice and outweighs the privilege for certain information to be turned over to Plaintiff's counsel. The information is contained in this material that I have in my hand.
>
> For the record, basically, what I have done is delineated information concerning [Defendant] that may have some bearing on issues in this case using the date of June 28, 2005, as the cutoff date. I am withholding and upholding the privilege with regard to any medical information that has to do with dates and times after June 28, 2005.

On appeal, we have no way to ascertain whether the documents submitted in Defendant's supplement to the record are the same documents that the trial court turned over to Plaintiff at trial. Defendant avers that she believes they are, but there is no evidence that the trial court ever settled this matter.

Therefore, we must presume that the trial court correctly produced documents to Plaintiff in accordance with the court's order. *See id.* at 619-20, 513 S.E.2d at 565. Accordingly, Defendant's argument is overruled.

*E. Plaintiff's Questions Regarding Defendant's Records*

Defendant next argues that the trial court erred in allowing counsel for Plaintiff to question her (1) concerning the information contained in Defendant's medical records that the trial court ordered produced to counsel for Plaintiff, as well as the sealed affidavits provided by Defendant, and (2) with regard to Defendant's alleged "legal duty" to advise the decedent that Defendant was taking medications at the time of the operation. Defendant contends that certain of those questions were irrelevant, highly prejudicial, improper without the support of medical expert testimony, and inadmissible hearsay. We find no error.

*i. Legal Background and Standards of Review*

Rule 401 of the North Carolina Rules of Evidence establishes that evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule

401 (2013). All relevant evidence is admissible unless otherwise provided by rule or law. N.C. Gen. Stat. § 8C-1, Rule 402. "Evidence which is not relevant is not admissible." *Id.* "Although the trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard . . . , such rulings are given great deference on appeal." *Dunn v. Custer*, 162 N.C. App. 259, 266, 591 S.E.2d 11, 17 (2004) (citation and internal quotation marks omitted).

Rule 403 of the North Carolina Rules of Evidence provides that relevant evidence may nonetheless "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needles presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403. We review a trial court's decision regarding whether to exclude evidence under Rule 403 for abuse of discretion. *Wolgin v. Wolgin*, 217 N.C. App. 278, 283, 719 S.E.2d 196, 200 (2011).

Rule 611 of the North Carolina Rules of Evidence provides the following direction with regard to the manner and order of questioning and the presentation of evidence at trial:

(a) *Control by court.* — The court shall exercise reasonable control . . . so as to (1) make the interrogation and presentation effective for ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

(b) *Scope of cross-examination.* — A witness may be cross-examined on any matter relevant to any issue in the case, including credibility.

(c) *Leading questions.* — Leading questions should not be used on direct examination of a witness except as may be necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

N.C. Gen. Stat. § 8C-1, Rule 611. This Court has determined that the trial court's rulings regarding questioning by an attorney on direct examination and cross-examination under Rule 611 is reviewed for abuse of discretion. *State v. Thompson*, 22 N.C. App. 178, 180, 205 S.E.2d 772, 774 (1974) (holding that the trial court did not abuse its discretion in allowing the prosecutor to ask his own witness leading questions relating to matters not giving rise to the charge); *Williams v. CSX Transp., Inc.*, 176 N.C. App. 330, 336, 626 S.E.2d 716, 723 (2006) ("The trial court is vested with broad discretion in controlling the scope of cross-examination[,] and a ruling by the trial court

should not be disturbed absent an abuse of discretion and a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision.").

We also note that, when considering alleged evidentiary errors in civil cases, "[n]o error . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action amounts to the denial of a substantial right." N.C. Gen. Stat. § 1A-1, Rule 61 (2013). An error affects a substantial right of the appellant when it prejudiced her and, thus, when "it is likely that a different result would have ensued had the error not been committed." *In re Chasse*, 116 N.C. App. 52, 60, 446 S.E.2d 855, 859 (1994) (citation omitted).

*ii. On the Issue of Impairment During Surgery*

Defendant argues that the trial court erred in allowing counsel for Plaintiff to question her about information contained in Defendant's medical and pharmaceutical records as well as the sealed affidavits she provided to the trial court in 2010 because such information was not relevant and was "highly prejudicial" in nature. Specifically, Defendant contends that this line of questioning "inevitably tainted the entire trial"

and that Plaintiff exceeded the bounds of permissible examination by asking about side effects discussed in affidavits submitted by Defendant's health care providers in 2010. Lastly, Defendant asserts that the trial court erred by permitting this testimony because a party must present "medical expert testimony" whenever cross-examining another party regarding "the potential side effects of medications being taken by that party." We are unpersuaded.

As a preliminary matter, we note that Defendant was called and questioned by counsel for Plaintiff as a part of Plaintiff's case in chief. The questioning Defendant refers to as impermissible occurred entirely on direct and redirect examination of Defendant, an adverse party. Therefore, pursuant to Rule 611, leading questions were permissible. N.C. Gen. Stat. § 8C-1, Rule 611(c). In addition, it is helpful to understand that this case was tried under a theory of negligence as established by the doctrine of *res ipsa loquitur*.

> Uniformly, in this and other courts, *res ipsa loquitur* has been applied to instances where foreign bodies, such as sponges . . . , are introduced into the patient's body during surgical operations and left there.
>
> . . . .

. . . [T]he well-settled law in this jurisdiction is and has been that a surgeon is under a duty to remove all harmful and unnecessary foreign objects at the completion of the operation. Thus the presence of a foreign object raises an inference of a lack of due care. When a surgeon relies upon nurses or other attendants for accuracy in the removal of sponges from the body of his patient, he does so at his peril. . . .

. . . .

. . . The application of *res ipsa loquitur* allows the issue of whether [the] defendant has complied with the statutory standard to be submitted to the jury for its determination. Although the application of the doctrine requires the submission of the issue to the jury, *the burden remains upon the plaintiff to satisfy the jury that the defendant has failed to comply with the statutory standard*. [The d]efendant's evidence that he complied with the statutory standard does not remove the case from the jury's determination. As the trier of the facts, the jury remains free to accept or reject the testimony of [the] defendant's witnesses.

*Tice v. Hall*, 310 N.C. 589, 592-94, 313 S.E.2d 565, 567-68 (1984) (citations and internal quotation marks omitted; emphasis and certain italics added). Therefore, the testimony of Defendant, elicited on direct examination by Plaintiff's counsel, is relevant and admissible to the extent that it makes the existence of any fact that is of consequence to the jury's

determination more or less likely to be true and is not otherwise inadmissible.

On direct examination of Defendant, counsel for Plaintiff questioned her extensively about whether she had taken narcotic and non-narcotic pain medications leading up to and during the surgery. Defendant responded that she was taking narcotic pain medications leading up to the surgery, but that she only took non-narcotic pain medications during the surgery. Defendant also stated that side effects from the narcotic pain medications were not present at the time of the surgery.

Plaintiff questioned Defendant further about information contained in sealed affidavits that Defendant provided to the trial court in 2010. Counsel for Plaintiff did not reference the affiants or their affidavits, but used the information contained therein to question Defendant about side effects that she experienced after the surgery when taking the same narcotic medications[16] that she admitted to taking before the surgery. Though Defendant acknowledged that she took the same narcotic medications before and after the surgery, she only admitted to experiencing side effects *after* the surgery.

---

[16] Defendant was prescribed an increased amount of one of those medications during this time.

The questions asked by counsel for Plaintiff sought to elicit and did elicit relevant testimony. Whether Defendant was using pain medication in the period of time leading up to and during the surgery addresses whether she may have breached her duty of care during the surgery. As Defendant admitted, the side effects from some of her medications "might" have had an effect on a doctor's capabilities. Moreover, the extent to which those same medications may have caused Defendant to experience confusion and impairment of cognitive function at a later point in time is relevant to whether those admittedly appreciable side effects occurred prior to and during the surgery. Defendant's responses to Plaintiff's questions dealt with these issues. As a result, her testimony had some tendency to make consequential facts more or less likely to be true and, therefore, was relevant. In addition, given our opinion in *Nicholson I*, which concluded that certain of Defendant's medical records could be relevant, and considering Plaintiff's burden of establishing not only that the sponge was left in the decedent's body, but of satisfying the jury that Defendant failed to comply with her duty of care in allowing the sponge to be left in the decedent's body, we conclude that it was not an abuse of discretion for the trial court to decline to exclude this line of questioning under

Rule 403. Accordingly, Defendant's argument is overruled to the extent that it relates to relevance and prejudice.

Defendant argues further, however, that Plaintiff's questions regarding the side effects of the medications were inappropriate because (1) the questions were not supported by expert testimony as to the side effects, and (2) Plaintiff's reference to the side effects as coming from a "prescription warning that I obtained from a local pharmacist" was inadmissible hearsay. Again, we are unpersuaded.

Defendant's argument is based on the following questioning of Defendant by counsel for Plaintiff:

> Q. You said earlier as far as the Cymbalta[,] that you were taking that at the time you performed surgery on [the decedent], correct?
>
> A. I believe so.
>
> Q. Again, this is another prescription warning that I obtained from a local pharmacist.
>
> A. Uh-huh.
>
> Q. I want to read this and ask if you are familiar with this warning as it relates to the medication especially with you being a physician.
>
> A. Uh-huh.
>
> Q. This drug . . . may . . . make you dizzy or drowsy. Do not drive, use machinery, or do any activity that requires alertness.

Do you agree or disagree with the warning that goes with that medication?

A. I agree. If you have — if you're taking this medication and you have any dizziness or drowsiness as a side effect of that medication, then you should refrain from driving. But not everybody reacts to the medications the same way, and not everybody has the same side effects. But certainly, if you have those side effects, you should warn — you should heed those warnings. I do not have those side effects.

Q. Well, the warning says that the medication can affect your alertness. Now, number one, do you need to be alert in a long and complicated surgical procedure?

A. Yes, you do.

Q. In your opinion — even though you are aware of these warnings you take the medication. In your opinion, does it affect your alertness?

A. The Cymbalta?

Q. Yes.

A. No.

Q. Has it ever affected your alertness?

A. No.

Q. Has it ever made you drowsy?

A. No.

Q. So you've not had any problem with the warnings that they give?

A. Correct.

Q. That doesn't mean that you can't have those problems. I mean, certainly, you can; is that correct?

. . . .

A. Usually, if you're going to have those side effects, you experience them early on when you're given the prescription.

Defendant first argues that the above questioning was improper because it was not supported by expert testimony as required by *Smith v. Axelbank*, __ N.C. App. __, 730 S.E.2d 840 (2012) and *Anderson v. Assimos*, 146 N.C. App. 339, 553 S.E.2d 63 (2001), *vacated in part and appeal dismissed on other grounds*, 356 N.C. 415, 572 S.E.2d 101 (2002). We disagree.

The plaintiff in *Axelbank*, after experiencing deleterious side effects from a drug prescribed by her doctor, brought suit for medical malpractice or, alternatively, for negligence under a theory of *res ipsa loquitur*. __ N.C. App. at __, 730 S.E.2d at 842. Her complaint did not include certification by a medical expert pursuant to Rule 9(j) of the North Carolina Rules of Civil Procedure. *Id.*

> Rule 9(j) states that a complaint alleging medical malpractice shall be dismissed unless a plaintiff asserts in her complaint that her medical care has been reviewed by a person who is willing to testify that the medical care did not comply with the

> applicable standard of care, and that this
> person must be reasonably expected to
> qualify as an expert witness under . . .
> Rule 702 or must be a person the plaintiff
> will seek to have qualified as an expert
> . . . . Alternatively, a plaintiff must
> allege facts establishing negligence under
> the doctrine of *res ipsa loquitur.*

*Id.* On appeal, we held that the trial court properly dismissed the plaintiff's complaint for failure to state a claim because she did not include certification under Rule 9(j) and she failed to allege facts establishing negligence under the doctrine of *res ipsa loquitur.* __ N.C. App. at __, 730 S.E.2d at 842–43 ("Here, a layperson would not be able to determine that [the] plaintiff's injury was caused by [the drug] or be able to determine that [the doctor] was negligent in prescribing the medication to [the] plaintiff without the benefit of expert testimony.").

In *Assimos*, the plaintiff brought suit against her doctor for medical malpractice under a theory of *res ipsa loquitur* due to side effects she experienced as a result of the doctor's alleged "failure to adequately[,] properly[,] and fully inform her of the risks known to be associated with the administration of [a] drug . . . given to [her] during her treatment." 146 N.C. App. at 340, 553 S.E.2d at 65. The plaintiff's complaint did not include a Rule 9(j) certification. *Id.* at 342, 553 S.E.2d at 66.

Relevant to the issues we are considering in this case, we held that the trial court did not err in dismissing the plaintiff's medical malpractice action for failure to state a claim of negligence under the doctrine of *res ipsa loquitur*. *Id.* at 343, 553 S.E.2d at 67. We noted that the side effects of the drug were not within the jury's common knowledge, and, therefore, expert testimony was necessary to establish the relevant standard of care. *Id.*

*Axelbank* and *Assimos* address a plaintiff's obligation to include medical expert certification with her complaint when the doctrine of *res ipsa loquitur* does not apply to establish an inference of negligence. Here, however, the parties are not at the pleading stage, and the applicability of the doctrine of *res ipsa loquitur* is not at issue. Our Supreme Court has already made clear that there is a defined standard of care in cases involving foreign objects left in the body and that the legal doctrine of *res ipsa loquitur* is applicable on the issue of breach of that standard of care. *Tice*, 310 N.C. at 592-94, 313 S.E.2d at 567-68. The questions regarding the side effects from Defendant's medications were asked to confirm the inference that Defendant was negligent while performing the surgery. Indeed, when the standard of care is established pursuant to the

doctrine of *res ipsa loquitur*, as here, our opinions in *Axelbank* and *Assimos* indicate that expert testimony is *not necessary* to establish the relevant standard of care. Accordingly, Defendant's argument is overruled as it relates to whether expert testimony was required to establish the side effects of the drugs taken by Defendant.

Defendant also argues that the challenged questioning was improper because Plaintiff's reference to the warning Plaintiff's counsel obtained from the local pharmacist constitutes inadmissible hearsay with regard to the side effects of the medications she was taking. We disagree.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801. Subject to a number of well-defined exceptions, hearsay is inadmissible. N.C. Gen. Stat. § 8C-1, Rule 802. In this case, Plaintiff's questions were not asked to establish the truth of the warnings obtained from the pharmacist nor to prove the particular side effects of the medications Defendant was taking. Rather, they were asked to elicit Defendant's testimony regarding the extent to which her medications might have affected her judgment during the surgery.

Therefore, this line of questions did not constitute inadmissible hearsay. Accordingly, Defendant's argument is overruled.

### iii. On the Issue of Defendant's Alleged Duty to Advise

Defendant next argues that the trial court erred by allowing counsel for Plaintiff to ask Defendant whether she had a "legal duty" to advise the decedent regarding Defendant's use of medications prior to the surgery. Citing this Court's opinion in *Atkins v. Mortenson*, 183 N.C. App. 625, 644 S.E.2d 625 (2007), Defendant contends that such questioning should have been supported by expert testimony establishing the relevant standard of care. We disagree.

In *Atkins*, we affirmed the trial court's award of summary judgment to the defendant doctor in the plaintiff's medical malpractice action for failure of the doctor to recognize symptoms of illness and recommend appropriate treatment. *Id.* at 630, 644 S.E.2d at 628. In so holding we pointed out that, in medical malpractice cases, the standard of care "generally involves specialized knowledge" and, therefore, expert testimony is necessary to show a breach of the standard. *Id.* at 630, 644 S.E.2d at 629. *Atkins* does not, however, stand for the proposition that an attorney is obligated in a *res ipsa loquitur*

case, in order to support direct examination of the defendant physician, to offer expert testimony regarding the standard of care for that physician's disclosure to her patient of information regarding the physician's use of medications. Rather, it addresses whether the plaintiff in that particular case was able to forecast sufficient evidence to withstand summary judgment.

Here, unlike *Atkins*, an inference of a lack of due care was raised because a foreign object — the sponge — was left in the decedent's body. *See Tice*, 310 N.C. at 594, 313 S.E.2d at 568. Therefore, as discussed above, expert testimony was not necessary as "the presence of a foreign object raises an inference of a lack of due care" sufficient to submit the case to the jury for determination of whether Defendant breached her duty. *See id.* at 593, 313 S.E.2d at 567. Furthermore, the cited portions of the transcript do not indicate that counsel for Plaintiff ever used the phrase "legal duty" when examining Defendant. Rather, counsel asked Defendant, for example, whether she felt "it necessary to tell any of [her] patients or to inform any of [her] patients [about her use of medications] so they [would] have an opportunity to decide for themselves

whether or not they want[ed her] doing the surgery."[17] Under the circumstances of this case, *Atkins* is unavailing. Accordingly, Defendant's argument is overruled.

*II. Evidence of the Decedent's Medical Bills*

Defendant also argues that the trial court erred in allowing Plaintiff to present evidence of the decedent's medical bills — totaling $1,219,660.36[18] — because approximately $860,000 of that total was "written off" by the Cumberland County Hospital System and never paid by any party. "By allowing Plaintiff[] to contend [that the decedent's] medical expenses totaled [over $1,000,000.00], rather than the true amount her estate was obligated to pay," Defendant argues, "the court [erroneously] permitted Plaintiff[] to substantially inflate the value of [his] claim in the minds of the jurors." Alternatively, Defendant contends that, if the introduction of these bills was

---

[17] Counsel for Plaintiff later asked one of Defendant's expert witnesses whether "there is . . . [a] legal or ethical obligation on the part of the doctor, or in this case a surgeon, to inform [her] patient prior to surgery that the physician is taking pain medication [including narcotics]," but that question is not challenged on appeal.

[18] In her brief, Defendant cites Plaintiff's Exhibit 3 for the fact that the medical bills totaled "$1,019,467.11." The copy of Plaintiff's Exhibit 3 submitted to this Court, however, states that the medical bills actually amounted to $1,219,660.36. Accordingly, we use the latter figure.

proper, she should have been allowed to introduce evidence of the fact that a substantial portion of the bills was written off by the hospital. Plaintiff responds that the medical bills were admissible, but the write-offs were not, pursuant to the collateral source rule. We conclude that the collateral source rule is not applicable here and, as a result, hold that the trial court erred by failing to admit evidence of the hospital system's write-offs.

For cases filed before 1 October 2011, the admissibility of evidence of medical expenses is governed by the common law collateral source rule.[19] According to that rule,

> evidence of a plaintiff's receipt of benefits for his or her injury or disability from sources collateral to [the] defendant generally is not admissible. These benefits include payments from both public and private sources. This rule gives force to the public policy which prohibits a tortfeasor from reducing [its] own liability for damages by the amount of compensation the injured party receives from an independent source. Evidence of collateral source payments violate the rule whether

---

[19] In 2011, the collateral source rule was abrogated by Rule 414 of the North Carolina Rules of Evidence with regard to evidence of past medical expenses. N.C. Gen. Stat. § 8C-1, Rule 414. Rule 414 is not applicable in this case, however, because Plaintiff's action was commenced in 2008, before the effective date of this new rule. *See* 2011 N.C. Sess. Law 283, sec. 4.2 (stating that Rule 414 applies to actions commenced on or after 1 October 2011).

> admitted in the defendant's case-in-chief or on cross[-]examination of the plaintiff's witness. The erroneous admission of collateral source evidence often must result in a new trial.

*Badgett v. Davis*, 104 N.C. App. 760, 763, 411 S.E.2d 200, 202 (1991) (citations, internal quotation marks, and brackets omitted), *disc. review denied*, 331 N.C. 284, 417 S.E.2d 248 (1992).

> The purpose of the collateral source rule is to exclude evidence of payments made to the plaintiff by sources other than the defendant when the evidence is offered for the purpose of diminishing the defendant tortfeasor's liability to the injured plaintiff. . . . The rule is punitive in nature[] and is intended to prevent the tortfeasor from a windfall when a portion of the plaintiff's damages have been paid by a collateral source.

*Wilson v. Burch Farms, Inc.*, 176 N.C. App. 629, 638–39, 627 S.E.2d 249, 257 (2006) (citations, internal quotation marks, and certain brackets omitted). In the context of medical malpractice, our Supreme Court has indicated that a source collateral to the defendant can include "a beneficial society, the plaintiff's family or employer, or an insurance company." *Cates v. Wilson*, 321 N.C. 1, 5, 361 S.E.2d 734, 737 (1987) (citation and internal quotation marks omitted). When payment comes from such a source, "an injured plaintiff is entitled to

recovery for reasonable medical, hospital, or nursing services rendered [her], whether these are rendered . . . gratuitously or paid for by [her] employer." *Id.* (citations, internal quotation marks, and ellipsis omitted). "In summary, the collateral source rule excludes evidence of payments made to the plaintiff by sources *other than the defendant* when this evidence is offered for the purpose of diminishing the defendant tortfeasor's liability to the injured plaintiff." *Badgett*, 104 N.C. App. at 764, 411 S.E.2d at 203.

Plaintiff relies on our opinion in *Badgett* to support his argument that the collateral source rule is applicable in this case. We disagree. In *Badgett*, the plaintiff sued his doctor in negligence for knowingly prescribing a drug to which the plaintiff was allergic. *Id.* at 761, 411 S.E.2d at 201. The plaintiff became ill and was treated at a hospital. *Id.* At trial, the court admitted evidence of the plaintiff's total hospital and doctor's bills, evidence that a portion of the bills had been paid by Medicare, and evidence that, "according to the hospital's contract with Medicare, the unpaid balance was written off and could not thereafter be collected from the plaintiff." *Id.* at 762, 411 S.E.2d at 201-02. On appeal, we held that the admission of the Medicare payments and contractual

write-offs, which we referred to as "gratuitous government benefits," was prejudicial and in violation of the rule. *Id.* at 764, 411 S.E.2d at 203.

In this case, unlike *Badgett*, the hospital bills were not paid by an independent third party. There is no evidence in the record that Medicare, Medicaid, some other insurance company, a beneficial society, Plaintiff's family, or Plaintiff's employer paid a portion of the decedent's medical bills and/or procured the write-offs. Rather, the bills appear to have been forgiven by the hospital of its own accord as a business loss. In an affidavit obtained by Defendant and not admitted into evidence,[20] the hospital's custodian of records characterized the unpaid medical bills as "'[r]isk [m]anagement' write-offs," which "were not paid by any source (including the patient or insurance company)." In addition, the evidence in the record indicates that the hospital was also a defendant in a separate suit brought by Plaintiff arising out of the same facts. The hospital ultimately settled that lawsuit, and the amount of that settlement was applied to reduce Plaintiff's verdict in this case.

---

[20] Defendant submitted the affidavit to the trial court as an offer of proof, however.

We can find no cases in this jurisdiction directly addressing the situation in which a defendant doctor in a medical malpractice case attempts to introduce evidence that a hospital, which has settled with the plaintiff in a separate action arising from the same facts, reduced the plaintiff's medical bills pursuant to "risk management" practices and not pursuant to a contract with a government entity like Medicare or with some other insurance company. Moreover, we have been unable to find any cases from other jurisdictions dealing with this particular, narrow factual scenario. Nevertheless, a number of courts have held, like *Badgett*, that the costs written off by a contract between a non-tortfeasor hospital and a government-funded assistance program like Medicare are not admissible under the collateral source rule. *See, e.g.*, *Pipkins v. TA Operating Corp.*, 466 F. Supp. 2d 1255 (D.N.M. 2006) (holding that the collateral source rule applied to contractual Medicare write-offs made by the injured plaintiff's health care provider). When the hospital is a separate tortfeasor and writes off medical expenses pursuant to an agreement with a third party, however, other courts have concluded that the collateral source rule is not applicable. *See, e.g.*, *Rose v. Via Christi Health Sys., Inc. / St. Francis Campus*, 279 Kan. 523, 529, 113 P.3d 241, 246

(2005) ("Under the facts of this case, the source of the $154,000 of medical services not reimbursed by Medicare was [the hospital], the tortfeasor, not an independent source."); *Williamson v. St. Francis Med. Ctr., Inc.*, 559 So.2d 929, 934 (La. App. 2 Cir. 1990) (holding that the collateral source rule did not apply to allow the plaintiffs to recover medical bills cancelled by the hospital pursuant to an agreement with Medicare because "the hospital, to whom the bill was owed, was also a tort[]feasor" and, therefore, the benefit to the plaintiffs resulted from the hospital's own "procuration or contribution").

Here, the record does not indicate that the decedent's medical bills were written off pursuant to an agreement with an independent party. Rather, they were discharged by the hospital, also an alleged tortfeasor, which ultimately settled with Plaintiff. Unlike *Badgett*, the paying party in this case was not independent and not collateral to this matter. The payment was made by a separate, alleged tortfeasor and not pursuant to an agreement with a separate, collateral source. Therefore, we hold that the collateral source rule is not applicable to bar evidence of the hospital bills that were written off by the Cumberland County Hospital System. Accordingly, Plaintiff was entitled to introduce evidence of the decedent's medical bills,

but Defendant was also entitled to introduce evidence that some of those bills were written off by the hospital. As a result, we hold that the trial court erred in denying Defendant's motion to introduce evidence of the write-offs and, therefore, abused its discretion in denying her Rule 60(b) motion for a new trial as it relates to the issue of damages.[21] *See generally Sink v. Easter*, 288 N.C. 183, 198, 217 S.E.2d 532, 541 (1975) ("[A] motion for relief under Rule 60(b) is addressed to the sound discretion of the trial court[,] and appellate review is limited to determining whether the court abused its discretion.").

*III. Instruction on Permanent Injury*

Though we have already determined that Defendant is entitled to a new trial on damages, we address Defendant's argument that the trial court erred by instructing the jury on "permanent injury" in the interests of judicial economy and for the purpose of avoiding further appeal regarding the propriety of the trial court's jury instructions on damages. Defendant contends that the trial court erred by instructing on permanent injury because the purpose of the permanent injury jury

---

[21] For the reasons discussed in the foregoing sections, we hold that the trial court did not otherwise abuse its discretion in failing to grant Plaintiffs' motions for remittitur and for a new trial.

instruction "is to guide the jury in how it should determine the value of *future damages* [to the injured party] at the time of trial" and the decedent was not alive at that time. (Emphasis added). In response, Plaintiff asserts that the instruction was proper because it was "abundantly clear" from the evidence that Plaintiff was only seeking damages for the decedent's personal injuries and his own loss of consortium, not for the decedent's life expectancy. We agree with Defendant.

As a preliminary matter, we note that Plaintiff brought no action for wrongful death. Therefore, the trial court's permanent injury instruction was only relevant to Plaintiff's actions seeking personal injury damages. In that context, the trial court instructed on permanent injury, in near word-for-word compliance with our pattern jury instructions, as follows:

> Damages for personal injury also include fair compensation for permanent injury incurred by the plaintiff as a proximate result of the negligence of the defendant. An injury is permanent when any of its effects continued throughout the plaintiff's life. These effects may include medical expenses, pain and suffering, scarring and disfigurement, partial loss of use of part of the body incurred or experienced by the plaintiff over her life expectancy.
>
> Once again, however, the plaintiff is not entitled to recover twice for the same element of damages; therefore, you should not include any amount you've already

> allowed for medical expenses, pain and suffering, and scarring or disfigurement or partial loss of use of part of the body because of permanent injury.
>
> Life expectancy is the period of time the plaintiff may reasonably have been expected to live.

After its definition of life expectancy, the trial court moved on to a discussion of negligence. The trial court omitted the following additional language from our pattern jury instructions:

> [The life expectancy tables are in evidence.] [The court has taken judicial notice of the life expectancy tables.] They show that for someone of the plaintiff's present age, (*state present age*), *his* life expectancy is (*state expectancy*) years.
>
> In determining the plaintiff's life expectancy, you will consider not only these tables, but also all other evidence as to *his* health, *his* constitution and *his* habits.

N.C.P.I. — Civil 810.14 (June 2012) (emphasis in original).

Beyond the alternative sentences set off in brackets, our pattern jury instructions do not indicate that the omitted text is optional. Though the charge conference does not disclose the court's rationale for omitting this text, the likely reason is that the decedent was not alive at the time of trial. It is entirely nonsensical to admit life expectancy tables and thereafter instruct the jury on the decedent's *life expectancy*

when she is no longer living and no claim for wrongful death is being brought. The omitted language reveals, therefore, that the permanent injury jury instruction, in the context of Plaintiff's actions for personal injury damages, is not intended to cover past damages. Past damages can be addressed, as they were in this case, by instructions on other forms of damages. The purpose of the permanent injury instruction, however, is to compensate the plaintiff for *additional* future harm that she is expected to experience because of a permanent injury that she suffered as a proximate result of the defendant's conduct. *See generally* David A. Logan & Wayne A. Logan, North Carolina Torts 182 (1996) ("Plaintiffs are entitled to recover for the *future damages* associated with permanent injuries.") (emphasis added); William S. Haynes, North Carolina Tort Law 907-08 (1989) ("The term 'permanent injuries,' may be defined as those injuries that are reasonably certain to be followed by permanent impairment to earn money, or producing permanent and irremediable pain. . . . Damages for permanent disability are, therefore, addressed in the elements of damage referred to as loss of future earning capacity or future pain and suffering, as opposed to being recoverable in and of themselves. It logically follows that where permanent injuries exist the proper element of damages

into which such injuries fall are a permanent impairment or diminution of the plaintiff's earning ability or power."). In light of the fact that the decedent was not alive at the time of the trial and Plaintiff did not bring suit for wrongful death, we conclude that the trial court's instruction on permanent injury was erroneous.

*Conclusion*

For the foregoing reasons, we find no error in the trial of this case on the negligence issues. We remand for a new trial on damages.

NO ERROR in part; NEW TRIAL on damages.

Judges BRYANT and DILLON concur.